

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | CRIMINAL NO. 2:19cr ___ |
| | ) | |
| RONALD A. VILLANUEVA, | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Defraud the United States |
| Defendant. | ) | (Count 1) |
| | ) | |
| | ) | 18 U.S.C. §§ 1519 and 2 |
| | ) | Falsification of Records |
| | ) | (Count 2) |
| | ) | |
| | ) | 18 U.S.C. §§ 1001(a)(3) and 2 |
| | ) | Aiding and Abetting |
| | ) | False Written Statements |
| | ) | (Counts 3 & 4) |

**INDICTMENT**

January 2019 Term – at Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

**GENERAL ALLEGATIONS**

**A.      The Small Business Administration's 8(a) Program**

1.      The Small Business Administration ("SBA") is an independent agency of the

United States.    Its mission is to aid, counsel, and assist small businesses by providing access to

capital, training and development programs for entrepreneurs, and opportunities to compete for

government contracts.

2.      The SBA oversees a federal program known as the Section 8(a) program.    The

purpose of the 8(a) program is to help small, disadvantaged businesses compete in the American

economy through business development.    13 Code of Federal Regulations ("C.F.R.") § 124.1.
Under the 8(a) program, small businesses owned and controlled by economically and socially
disadvantaged persons are eligible to obtain various kinds of SBA assistance and to receive
certain preferences in the award of federal contracts.    For example, in certain circumstances,
federal contracting officials can award procurements to 8(a) firms on a "sole source" basis,
meaning that such contracts can be awarded absent competing offers from other firms.    In
addition, federal contracting officers can, subject to certain limitations, restrict competition on a
procurement to 8(a) firms.    These opportunities are often referred to as "set-aside" contracts.

      3.     A firm is eligible to join the 8(a) program "if it is a small business which is
unconditionally owned and controlled by one or more socially and economically disadvantaged
individuals."    13 C.F.R. § 124.101.

      4.     In addition, "no non-disadvantaged individual or immediate family member
may . . . [e]xercise actual control or have the power to control" an 8(a) firm.    13 C.F.R.
§ 124.106(e)(1).    A non-disadvantaged individual is "any individual who does not claim
disadvantaged status, does not qualify as disadvantaged, or upon whose disadvantaged status an
applicant or Participant does not rely in qualifying for [the 8(a) program]."    13 C.F.R. § 124.3.

      5.     Control in this context means both "strategic policy setting" and "day-to-day
management and administration of business operations."    13 C.F.R. § 124.106.    A participant
in the 8(a) program "must be managed on a full-time basis by one or more disadvantaged
individuals."    13 C.F.R. § 124.106(a)(1).    Such a person "must devote full-time to the
business."    13 C.F.R. § 124.106(a)(3).

      6.     According to SBA regulations, "[n]on-disadvantaged individuals or entities may
be found to control or have the power to control" an 8(a) firm when, among other reasons,

"[b]usiness relationships exist with non-disadvantaged individuals or entities which cause such dependence that the applicant or Participant cannot exercise independent business judgment without great economic risk."   13 C.F.R. § 124.106(g)(4).

7.     A business seeking to participate in the 8(a) program must submit an application to the SBA.   The SBA then determines whether the listed owner is a disadvantaged person (socially and economically), whether the business has been properly formed, and whether the owner is otherwise eligible.   The applicant must also report any affiliations with other companies, because those affiliations could show that someone other than the disadvantaged person is in control of the business.

8.     After the SBA approves a firm's application to join the 8(a) program, the SBA district office in the firm's home state provides assistance to the business in finding federal contracting opportunities.   The district office also conducts annual reviews of the business to determine its continued eligibility for participation in the program.   As part of these annual reviews, the business must submit "[a] certification that it meets [applicable] eligibility requirements," including compliance with rules regarding ownership and control of the firm. 13 C.F.R. § 124.112(b)(1).

9.     Businesses may only participate in the 8(a) program for nine years.   13 C.F.R. § 124.2.   As an 8(a) firm approaches the end of its nine-year term, it must work with the SBA to ensure that it "do[es] not develop an unreasonable reliance on 8(a) awards."   13 C.F.R. § 124.509(a)(1).   For that reason, 8(a) firms must, by regulation, meet certain non-8(a) business targets each year.   Firms must also submit business plans to the SBA that outline their "prospects for profitable operations during and after [their] participation in the 8(a) [business development] program."   13 C.F.R. § 124.402(c)(3).

3

10.     Because the 8(a) program seeks to empower participating firms to succeed on their own in the marketplace, "[o]nce a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) [business development] program, neither the concern nor that individual will be eligible again."   13 C.F.R. § 124.108(b).

11.     The SBA can revoke a firm's 8(a) status during its nine-year term if the agency determines that it no longer meets the criteria for certification.   SBA regulations require firms to inform the SBA of any changes that would adversely affect eligibility for the 8(a) program. 13 C.F.R. § 124.112(b)(2).   The SBA also may terminate a firm from the 8(a) program for good cause, such as submission of false information or failure to maintain eligibility requirements. 13 C.F.R. § 124.303(a).

12.     After a firm either "graduates" or loses its 8(a) eligibility, it cannot reapply, even if it changes its name or management.

**B.     The Small Business Administration's Women-Owned Small Business Program**

13.     In addition to the 8(a) program, the SBA administers other programs designed to support women-owned small businesses.   One of these is the Women-Owned Small Businesses ("WOSBs") program.   Under 15 U.S.C. § 637(m), federal contracting officers may restrict competition to eligible WOSBs for procurements in certain industries.   To be eligible to compete for WOSB set-aside contracts, a business must be at least "51 percent owned by one or more women," 15 U.S.C. § 637(m)(2)(A), and "the management and daily business operations of the business [must be] controlled by one or more women," 15 U.S.C. §§ 637(m)(1)(B), 632(n)(2).

14.     WOSBs must certify to the federal government that they are eligible to participate in the WOSB program.   These certifications must include a representation that the firm is "at

4

least 51 percent owned and controlled by one or more women."   13 C.F.R. § 127.300(b)(2)(ii).
In this context, "[c]ontrol by one or more women . . . means that both the long-term decision
making and the day-to-day management and administration of the business operations must be
conducted by one or more women."   13 C.F.R. § 127.202(a).

**C.**      **Relevant Individuals**

15.      The defendant, RONALD A. VILLANUEVA, resided in Virginia Beach,
Virginia.   Between approximately January 2010 and January 2018, Villanueva served as a
member of the Virginia House of Delegates.

16.      Conspirator-1 was married to Conspirator-2.   At the beginning of 2005,
Conspirator-1 and Conspirator-2 lived in northern Virginia.

17.      Conspirator-3 is related to the defendant, Villanueva, by marriage.   At the
beginning of 2007, Conspirator-3 lived in northern Virginia.

**D.**      **SEK's Initial Participation in the 8(a) Program**

18.      In the early 2000s, Conspirator-1 and Conspirator-2 decided to start a small
business, SEK Solutions, LLC ("SEK"), based on Conspirator-1's experience selling software
and other computer-related services.   In March 2001, Conspirator-2 incorporated SEK in the
Commonwealth of Virginia with Conspirator-2 as SEK's sole owner.   Early in SEK's history,
Conspirator-2 managed the business's operations and Conspirator-1 managed its sales.

19.      In July 2001, SEK applied to join the SBA's 8(a) program on the basis of
Conspirator-2's disadvantaged status as the sole owner of the company.

20.      SEK received its 8(a) certification from the SBA in November 2001.   The
certification lasted for a non-renewable term of nine years, expiring in November 2010.

21.      Between 2001 and 2005, SEK experienced only limited success.   Between

5

December 2001 and November 2004, for example, it reported to the SBA that it had earned $0 in sales through the 8(a) program.   During this period, SEK's offices were in Chantilly, Virginia, near where Conspirator-1 and Conspirator-2 lived.

**E.      SEK Relocates to Virginia Beach**

22.      In or about spring 2005, Conspirator-1 decided to relocate SEK's offices to Virginia Beach.   As part of the move, Conspirator-1 met the defendant, RONALD A. VILLANUEVA.   Villanueva had extensive experience pursuing 8(a) contracts and agreed to assist Conspirator-1 in managing SEK's business from Virginia Beach.

23.      Within months, and by the latest in or about January 2006, SEK's operations shifted almost entirely to Virginia Beach.   At the same time, Conspirator-2's involvement in the company decreased.   By January 2006, Conspirator-2 had ceded practically all control of SEK to Conspirator-1 and Villanueva, who together managed the company's day-to-day operations and sales efforts.

24.      By January 2006, Conspirator-1 began making regular trips to Virginia Beach to manage SEK.   While Conspirator-2 periodically traveled to Virginia Beach to spend time with Conspirator-1, Conspirator-2 did not conduct business on these trips.

25.      SEK continued to participate in the 8(a) program through November 2010. During this period, Conspirator-2 had little insight into SEK's business even though Conspirator-2 purportedly controlled the company.

26.      During the period between 2005 and 2010, after SEK relocated to Virginia Beach, the conspirators made numerous false, fraudulent, and misleading statements to the SBA regarding (i) SEK's eligibility for participation in the 8(a) program, (ii) Conspirator-2's control over SEK and day-to-day management of its affairs, and (iii) SEK's relationship with one of its

6

suppliers.

**F.      The Creation of Karda and Its Participation in the 8(a) Program**

27.      In or around 2007, the defendant, RONALD A. VILLANUEVA, and

Conspirator-1 came to believe that the success of their business required them to find a way to

continue selling products through the 8(a) program even after SEK's 8(a) status expired in 2010.

They therefore devised a plan to form a new 8(a) company that they would secretly control.

28.      Sometime in 2007, Villanueva and Conspirator-1 met with Conspirator-3,

Villanueva's relative by marriage.   At the time, Conspirator-3 lived and worked in northern

Virginia and had never met Conspirator-1.   Together, Villanueva and Conspirator-1 encouraged

Conspirator-3 to start a new business.   Such a business would, like SEK, be dedicated to selling

products to government customers, and would, like SEK, be based in Virginia Beach.

Villanueva and Conspirator-1 told Conspirator-3 that they would teach him how to start a small

business and would help run the new company.   At the time, Conspirator-3 had only modest

experience in government contracting and no experience running a business.   Even so,

Conspirator-3 agreed to move to Virginia Beach to start a new company, as Villanueva and

Conspirator-1 had suggested.

29.      By the fall of 2007, Conspirator-3 had relocated to Virginia Beach.   In or about

November 2007, with the assistance of others, Conspirator-3 incorporated Karda Systems, LLC

("Karda") with the Virginia State Corporation Commission.   The incorporation documents

listed Conspirator-3 as Karda's sole member.

30.      Shortly after Conspirator-3 moved to Virginia Beach, it became apparent that

Conspirator-3 was not going to have a meaningful role in managing Karda at all.   Instead,

Villanueva and Conspirator-1 arranged for Conspirator-3 to operate a retail storefront for Karda

located within the headquarters of another company. In this position, Conspirator-3 sold mostly small quantities of products to members of the general public. In an email from January 2008 relating to this arrangement, Villanueva referred to Conspirator-3 as "our young apprentice."

31. Villanueva and Conspirator-1 explained to Conspirator-3 that SEK's 8(a) status was set to expire in 2010. They told Conspirator-3 that they wanted Karda to obtain its own 8(a) certification so that persons working for SEK could continue pursuing valuable 8(a) contracts for which they would otherwise be unable to compete.

32. In an email dated February 26, 2009, an accountant working for SEK asked Conspirator-1 how to book certain expenses that SEK had paid on Karda's behalf. Conspirator-1 replied, copying Villanueva: "I don't mind doing the expense for Karda, but can we call it something else on our books? SBA will not look too kindly on the fact that we are trying to get Karda up and running to make them an 8(a)."

33. In an email exchange on June 15, 2010, about their mutual priorities, Conspirator-1 emailed Villanueva: "I don't see [K]arda on your priority list below...Lol! Karda has to be first. Let's get it done bro...Please! None of this shit means crap if we have no 8a." Villanueva responded: "Its done buddy. He just sent [it]."

34. Karda applied to join the 8(a) program in or about June 2010 on the basis of Conspirator-3's disadvantaged status. It received its 8(a) certification in or about December 2010, and continued to compete for and win 8(a) contracts through December 2014 and beyond.

35. Karda eventually developed a multi-million dollar contracting business selling products to the federal government. Between 2007 and 2014, Conspirator-3 had practically no insight into this business, as it was run almost entirely by employees or former employees of SEK while Conspirator-3 operated the retail storefront.

36.     Between 2007 and 2014, Villanueva, Conspirator-1, and SEK extracted money from Karda in a variety of ways.   These included consulting fees, rent, and other purportedly business-related expenses.

37.     During the period between 2010 and 2014, the conspirators made numerous false, fraudulent, and misleading statements to the SBA about Karda's relationship to SEK and the minimal level of control that Conspirator-3 exercised over Karda and its day-to-day functions.

## G.     Contracts and Income Derived from SEK and Karda

38.     Government agencies are responsible for collecting and reporting data on federal contracts through the Federal Procurement Data System ("FPDS").   According to FPDS records, between 2005 and 2010 SEK was awarded over $60 million in 8(a) contracts.

39.     According to FPDS records, between 2011 and 2014 Karda was awarded over $20 million in 8(a) contracts.

40.     During the period relevant to this Indictment, the defendant, RONALD A. VILLANUEVA, directed Conspirator-1 to pay a portion of the income generated from SEK into the bank account of one of Villanueva's immediate family members rather than directly into Villanueva's account.   According to bank records, in the period between 2007 and 2014, Villanueva and his immediate family member received approximately $1,040,000 in income from SEK and Karda.

## COUNT ONE

41.     The Grand Jury realleges and incorporates by reference the General Allegations listed in this Indictment.

### Object of the Conspiracy

42.     Beginning in or about May 2005, and continuing up to in or about December 2014, in the Eastern District of Virginia and elsewhere, the defendant, RONALD A. VILLANUEVA, did knowingly conspire, combine, confederate and agree with other persons, known and unknown to the grand jury, to defraud the United States, particularly the SBA, by impeding, impairing, obstructing and defeating through deceit, craft, trickery, and dishonest means the lawful government functions of the SBA in the ascertainment, assessment, and determination of whether the conspirators and their firms, SEK and Karda, should have been accorded status as participants in the SBA's 8(a) program and should have been permitted to continue as 8(a) participants when those firms were, in fact, ineligible to do so.

### Ways, Manner, and Means of the Conspiracy

43.     It was a part of the conspiracy that the conspirators would by deceit, craft, trickery and dishonest means, defraud the United States by interfering with and obstructing the lawful governmental functions of the SBA, in that the conspirators made numerous false representations and statements to the SBA after SEK moved its operations to Virginia Beach in 2005.   These false statements and representations related to (i) SEK's eligibility for participation in the 8(a) program, (ii) Conspirator-2's control over SEK and day-to-day management of its affairs, and (iii) SEK's relationship with one of its suppliers.

44.     It was further a part of the conspiracy that the conspirators' false statements about SEK interfered with and obstructed the SBA's ability to assess whether a "[n]on-

disadvantaged . . . entit[y]" had the power to control SEK by virtue of "[b]usiness

relationships . . . which cause[d] such dependence" that SEK could not "exercise independent

business judgment without great economic risk," in violation of 13 C.F.R. § 124.106(g)(4).

45.     It was further a part of the conspiracy that, with SEK's 8(a) status set to expire in

2010, Conspirator-1 and the defendant, RONALD A. VILLANUEVA, devised a scheme to

create a new entity, Karda, that they would secretly control and which would continue to serve as

the vehicle for their 8(a) business.

46.     It was further a part of the conspiracy that the conspirators made numerous false

statements and representations to the SBA in support of Karda's application to join the

8(a) program and its continuing participation in the program thereafter.   More specifically, the

conspirators falsely represented that Conspirator-3 controlled Karda and was responsible for its

day-to-day management when, in reality, Villanueva and others associated with SEK secretly

controlled Karda.

47.     It was further a part of the conspiracy that the conspirators' false statements to the

SBA interfered with and obstructed the SBA's ability to assess whether a "[n]on-

disadvantaged . . . entit[y]," namely SEK, had the power to control Karda by virtue of

"[b]usiness relationships . . . which cause[d] such dependence" that Karda could not "exercise

independent business judgment without great economic risk," in violation of 13 C.F.R.

§ 124.106(g)(4).

48.     It was further part of the conspiracy that the conspirators, including Villanueva,

received financial benefits from the fraudulently obtained 8(a) contracts awarded to SEK and

Karda.

<u>Overt Acts in Furtherance of the Conspiracy</u>

49.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

50.     During the SBA's site visit to SEK in Virginia Beach in 2005, Conspirator-2 falsely represented that she worked in Virginia Beach to manage SEK's affairs by meeting with an SBA representative in a borrowed office under the pretense that Conspirator-2 worked there. In reality, Conspirator-2 had never used that office before, never used it again, and never managed the affairs of SEK from Virginia Beach.

51.     On or about December 9, 2005; April 27, 2007; March 12, 2008; February 20, 2009; and January 12, 2010, Conspirator-2 signed documents certifying to the SBA that SEK "me[t] the requirements of 13 CFR 124.101 through 124.108."   These certifications were false and misleading, in that after 2005:

a.      SEK was not "unconditionally . . . controlled by one or more socially and
        economically disadvantaged individuals," *i.e.*, by Conspirator-2, as required by
        13 C.F.R. § 124.101;

b.      Conspirator-2 was not responsible for "strategic policy setting" and "day-to-day
        management and administration of business operations" at SEK, did not manage
        SEK "on a full-time basis," and did not "devote full-time to the business," as
        required by 13 C.F.R. § 124.106, 106(a)(1), and 106(a)(3);

c.      "[N]on-disadvantaged individual[s] or immediate family member[s]," namely
        Conspirator-1 and the defendant, RONALD A. VILLANUEVA, "[e]xercise[d]

actual control [and] ha[d] the power to control" SEK, in violation of 13 C.F.R.
§ 124.106(e)(1); and

d.      Conspirator-2 never disclosed, as was required in its annual review forms
mandated by 13 C.F.R. § 124.112(b), a substantial line of credit extended to SEK
by one of its suppliers.

52.      During the period relevant to this Indictment, the federal government maintained
a database known as the Online Representations and Certifications Application system, or
"ORCA," in which government contractors could complete certifications required under various
federal contracting programs.   On or about September 19, 2006; September 20, 2007;
September 26, 2008; September 27, 2009; and May 20, 2010, the defendant, RONALD A.
VILLANUEVA, certified in ORCA that SEK was a "[w]omen-owned business concern,"
including that its "management and daily business operations are controlled by one or more
women."   This was false, given that Conspirator-2 ceded management and control of SEK to
Conspirator-1 and Villanueva after 2005.

53.      On or about August 25, 2010, Villanueva drafted a letter to the SBA that was later
sent to the SBA by Conspirator-2.   Villanueva's letter was substantially misleading in that it
falsely characterized the nature of the relationship between SEK and one of its suppliers and
falsely characterized the extent to which SEK relied on other suppliers to fulfill its contracts with
government customers.

54.      On or about June 29, 2010, Conspirator-3 signed Karda's application to join the
SBA's 8(a) program.   The application was false and misleading, in that it:

a.      Failed to disclose, as was required, the affiliation between Karda and SEK;

13

b.  Failed to disclose, as was required, the fact that SEK had provided financial support, office space, and equipment to Karda; and

c.  Falsely stated that Conspirator-3 devoted 80 hours per week to the management of Karda, when he in fact did not.

55.  On or about July 14, 2010, Villanueva sent a letter, on his official House of Delegates letterhead, to the SBA in support of Karda's 8(a) application.   It stated, in part:   "I am writing in recommendation of Karda Systems LLC, owned and operated by Virginia Beach native [Conspirator-3]."   The letter was false and misleading, in that Villanueva knew that he and Conspirator-1 were the ones truly operating Karda, not Conspirator-3.

56.  On or about January 14, 2011, Conspirator-3 submitted a business plan for Karda to the SBA that was false and misleading.   For example, it stated:

a.  "I, [Conspirator-3], have the major responsibility for marketing, financial management, scheduling, cost estimates, bid and proposal development, quality control, and day to day project management oversight."   This was false. Conspirator-3 had little to no control over most or all of these functions.

b.  "[Conspirator-3] has full and complete oversight of all contracts."   This, too, was false.   Conspirator-3 had practically no insight into Karda's contracting business.

57.  On or about July 7, 2011, an employee at SEK emailed Villanueva and others regarding proposed edits to the website for Karda, seeking Villanueva's input.   In response, Villanueva directed the employee to "TAKE OUT ALL REFERENCES TO SEK ASAP!!!!!\"

58. Villanueva ghost-wrote communications on Conspirator-3's behalf for Conspirator-3 to send to the SBA. For example:

a. On or about January 17, 2012, Villanueva drafted a letter for Conspirator-3 to send to the SBA regarding Karda's 8(a) annual report.

b. On or about March 26, 2012, Villanueva drafted an email for Conspirator-3 to send to the SBA regarding the requirement to send audited financial statements to the SBA as part of Karda's compliance with the 8(a) program.

59. On or about April 19, 2013, Conspirator-2 sent a letter from SEK to the SBA. SEK's letter contained numerous false, fictitious, and fraudulent statements relating to control over the company, including:

a. "I [Conspirator-2] am the final decision maker of my company's operations and finances, and am fully involved in the everyday operation of my firm." This was false. Conspirator-2 had ceased to be involved in SEK's everyday operations as early as 2006.

b. "I [Conspirator-2] commute weekly to Virginia Beach to run SEK Solutions." This was false. Conspirator-2 did not regularly commute to Virginia Beach, and when Conspirator-2 did travel to Virginia Beach it was not to run SEK but to spend time with Conspirator-1.

c. "All final decisions are made by me and include finances, company strategy and mission, hiring and firing of personnel, and operations." This was false. In reality, Conspirator-1 and Villanueva handled most or all of these functions and had done so for years.

   d.  "[Conspirator-1] and [Villanueva] serve as Executive Vice Presidents, but do not exercise actual control or have the power to control the concern." This was false. In reality, Conspirator-1 and Villanueva exercised control over SEK and had done so since approximately 2006.

  60. On or about January 14, 2013, and January 17, 2014, Conspirator-3 signed documents certifying to the SBA that Karda "me[t] the requirements of 13 CFR 124.101 through 124.108." These certifications were false and misleading, in that:

   a.  Karda was not "unconditionally . . . controlled by one or more socially and economically disadvantaged individuals," *i.e.*, by Conspirator-3, as required by 13 C.F.R. § 124.101;

   b.  Conspirator-3 was not responsible for "strategic policy setting" and "day-to-day management and administration of business operations" at Karda, as required by 13 C.F.R. § 124.106; and

   c.  "[N]on-disadvantaged individual[s] or immediate family member[s]," namely Conspirator-1 and the defendant, Villanueva, "[e]xercise[d] actual control [and] ha[d] the power to control" Karda, in violation of 13 C.F.R. § 124.106(e)(1).

  61. Villanueva also helped manage SEK and Karda as, in effect, a single firm. For example, on or about March 14, 2014, Villanueva emailed employees at both companies announcing the hiring of a new "business development representative" whose job "will be assisting both SEK and Karda in the growth of their divisions, introducing his network to our solutions, and finding opportunities at home and abroad for all our efforts."

  62. On or about June 30, 2014, Villanueva emailed a representative from another business to market Karda's services as an 8(a) firm. Villanueva wrote: "[W]e are mentoring

my [family member's] 8(a) called Karda Systems and can help capture some 8(a) special ops and tactical opportunities."

63.    On or about July 24, 2014, Conspirator-3 signed a letter on behalf of Karda that was sent to the SBA.    It stated, in part:    "[Conspirator-3] is responsible for day-to-day management of Karda Systems, LLC."    This was false and misleading.    In reality, Conspirator-3 ran Karda's retail operation with minimal responsibility for Karda's day-to-day management and with little to no insight into Karda's primary business of selling products to the federal government.

(In violation of Title 18, United States Code, Section 371.)

## COUNT TWO

1.      The Grand Jury realleges and incorporates by reference the General Allegations listed in this Indictment.

2.      During the period from in or about June 2010 through in or about December 2014, in the Eastern District of Virginia, RONALD A. VILLANUEVA, the defendant, knowingly altered, concealed, covered up, falsified, and made a false entry in a record and document with the intent to impede, obstruct and influence the investigation and proper administration of a matter, that is, the proper administration of the 8(a) program, within the jurisdiction of a department and agency of the United States, that is, the SBA, and aided and abetted the same, in that the defendant, and other SEK and Karda employees, at his direction and with his encouragement, altered, falsified, and made false entries in Karda's submissions to the SBA to obtain acceptance into the 8(a) program and maintain Karda's 8(a) status thereafter under false pretenses, that is, by representing that Conspirator-3 controlled Karda and was responsible for its day-to-day management, when in reality Conspirator-3 was a mere figurehead and Karda was secretly controlled and managed by Villanueva and others associated with SEK.

(In violation of Title 18, United States Code, Sections 1519 and 2.)

## COUNT THREE

1.      The Grand Jury realleges and incorporates by reference the General Allegations listed in this Indictment.

2.      On or about January 17, 2014, within the Eastern District of Virginia, Conspirator-3 committed an offense against the United States, that is, the making of a false written statement, in violation of Title 18, United States Code, Section 1001(a)(3), in that:

   a.      Conspirator-3 drafted Karda's 8(a) Annual Update form for 2013, which was subsequently transmitted to the SBA on or about January 17, 2014.

   b.      This form contained Conspirator-3's signed certification that Karda met "the requirements of 13 C.F.R. 124.101 through 124.108" for participation in the 8(a) program.

   c.      As Conspirator-3 then well knew when the form was prepared and transmitted to the SBA, the aforesaid certification was materially false, fictitious and fraudulent in that (i) Karda was not controlled by Conspirator-3, as required by 13 C.F.R. § 124.101; (ii) Conspirator-3 was not responsible for "strategic policy setting" and "day-to-day management and administration of business operations" at Karda, as required by 13 C.F.R. § 124.106; and (iii) "non-disadvantaged individual[s]," namely Conspirator-1 and the defendant, "[e]xercise[d] actual control or ha[d] the power to control" Karda, in violation of 13 C.F.R. § 124.106(e)(1).

3.      The defendant, RONALD A. VILLANUEVA, aided, abetted, counseled, commanded, induced, and procured the commission of the offense described above and willfully caused it to occur.

(In violation of Title 18, United States Code, Sections 1001(a)(3) and 2.)

## COUNT FOUR

1.      The Grand Jury realleges and incorporates by reference the General Allegations listed in this Indictment.

2.      On or about July 24, 2014, within the Eastern District of Virginia, Conspirator-3 committed an offense against the United States, that is, the making of a false written statement, in violation of Title 18, United States Code, Section 1001(a)(3), in that:

   a.      In or about July 2014, Conspirator-3 signed a letter sent from Karda to the SBA regarding Karda's ongoing eligibility for the 8(a) program.

   b.      This letter, dated July 24, 2014, contained the statement that "[Conspirator-3] is responsible for day-to-day management of Karda Systems, LLC."

   c.      As Conspirator-3 then well knew when the letter was signed and transmitted to the SBA, the aforesaid statement was materially false, fictitious and fraudulent in that Conspirator-3 did not control Karda's finances, strategy, mission, hiring, firing, contracting, or operations, and was not in any meaningful sense "responsible for [its] day-to-day management."

3.      The defendant, RONALD A. VILLANUEVA, aided, abetted, counseled, commanded, induced, and procured the commission of the offense described above and willfully caused it to occur.

(In violation of Title 18, United States Code, Sections 1001(a)(3) and 2.)

*United States v. Ronald A. Villanueva*
Criminal No. 2:19cr 2

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

A TRUE BILL

_____
Foreperson

G. Zachary Terwilliger
United States Attorney

By:   *Daniel T. Young*
_____
      Daniel T. Young
      Alan M. Salsbury
      Assistant United States Attorneys
      Virginia State Bar Nos. 89707 & 15682
      United States Attorney's Office
      101 West Main Street, Suite 8000
      Norfolk, Virginia 23510
      Office:   (757) 441-6331
      Fax:      (757) 441-6689
      Email:    daniel.young@usdoj.gov
                alan.salsbury@usdoj.gov