FILED IN OPEN COURT

MAR 19 2019

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 2:19cr2 |
| ) | |
| RONALD A. VILLANUEVA, ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

### Relevant Background

**A.  The Small Business Administration's 8(a) Program**

1.  The Small Business Administration ("SBA") is an independent agency of the United States. Its mission is to aid, counsel, and assist small businesses by providing access to capital, training and development programs for entrepreneurs, and opportunities to compete for government contracts.

2.  The SBA oversees a federal program known as the Section 8(a) program. The purpose of the 8(a) program is to help small, disadvantaged businesses compete in the American economy through business development. 13 C.F.R. § 124.1. Under the 8(a) program, small businesses owned and controlled by economically and socially disadvantaged persons are eligible to obtain various kinds of SBA assistance and to receive certain preferences in the award of federal contracts. For example, in certain circumstances, federal contracting officials can award procurements to 8(a) firms on a "sole source" basis, meaning that such contracts can be

awarded absent competing offers from other firms. In addition, federal contracting officers can, subject to certain limitations, restrict competition on a procurement to 8(a) firms. These opportunities are often referred to as "set-aside" contracts.

3. A firm is eligible to join the 8(a) program "if it is a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals." 13 C.F.R. § 124.101.

4. In addition, "no non-disadvantaged individual or immediate family member may ... [e]xercise actual control or have the power to control" an 8(a) firm. 13 C.F.R. § 124.106(e)(1). A non-disadvantaged individual is "any individual who does not claim disadvantaged status, does not qualify as disadvantaged, or upon whose disadvantaged status an applicant or Participant does not rely in qualifying for [the 8(a) program]." 13 C.F.R. § 124.3.

5. Control in this context means both "strategic policy setting" and "day-to-day management and administration of business operations." 13 C.F.R. § 124.106. A participant in the 8(a) program "must be managed on a full-time basis by one or more disadvantaged individuals." 13 C.F.R. § 124.106(a)(1). Such a person "must devote full-time to the business." 13 C.F.R. § 124.106(a)(3).

6. According to SBA regulations, "[n]on-disadvantaged individuals or entities may be found to control or have the power to control" an 8(a) firm when, among other reasons, "[b]usiness relationships exist with non-disadvantaged individuals or entities which cause such dependence that the applicant or Participant cannot exercise independent business judgment without great economic risk." 13 C.F.R. § 124.106(g)(4).

7. A business seeking to participate in the 8(a) program must submit an application to the SBA. The SBA then determines whether the listed owner is a disadvantaged person

(socially and economically), whether the business has been properly formed, and whether the owner is otherwise eligible. The applicant must also report any affiliations with other companies, because those affiliations could show that someone other than the disadvantaged person is in control of the business.

8. After the SBA approves a firm's application to join the 8(a) program, the SBA district office in the firm's home state provides assistance to the business in finding federal contracting opportunities. The district office also conducts annual reviews of the business to determine its continued eligibility for participation in the program. As part of these annual reviews, the business must submit "[a] certification that it meets [applicable] eligibility requirements," including compliance with rules regarding ownership and control of the firm. 13 C.F.R. § 124.112(b)(1).

9. Businesses may only participate in the 8(a) program for nine years. 13 C.F.R. § 124.2. As an 8(a) firm approaches the end of its nine-year term, it must work with the SBA to ensure that it "do[es] not develop an unreasonable reliance on 8(a) awards." 13 C.F.R. § 124.509(a)(1). For that reason, 8(a) firms must, by regulation, meet certain non-8(a) business targets each year. Firms must also submit business plans to the SBA that outline their "prospects for profitable operations during and after [their] participation in the 8(a) [business development] program." 13 C.F.R. § 124.402(c)(3).

10. Because the 8(a) program seeks to empower participating firms to succeed on their own in the marketplace, "[o]nce a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) [business development] program, neither the concern nor that individual will be eligible again." 13 C.F.R. § 124.108(b).

11. The SBA can revoke a firm's 8(a) status during its nine-year term if the agency

determines that it no longer meets the criteria for certification. SBA regulations require firms to inform the SBA of any changes that would adversely affect eligibility for the 8(a) program. 13 C.F.R. § 124.112(b)(2). The SBA also may terminate a firm from the 8(a) program for good cause, such as submission of false information or failure to maintain eligibility requirements. 13 C.F.R. § 124.303(a).

12. After a firm either "graduates" or loses its 8(a) eligibility, it cannot reapply, even if it changes its name or management.

**B. The Small Business Administration's Women-Owned Small Business Program**

13. In addition to the 8(a) program, the SBA administers other programs designed to support women-owned small businesses. One of these is the Women-Owned Small Businesses ("WOSBs") program. Under 15 U.S.C. § 637(m), federal contracting officers may restrict competition to eligible WOSBs for procurements in certain industries. To be eligible to compete for WOSB set-aside contracts, a business must be at least "51 percent owned by one or more women," 15 U.S.C. § 637(m)(2)(A), and "the management and daily business operations of the business [must be] controlled by one or more women," 15 U.S.C. §§ 637(m)(1)(B), 632(n)(2).

14. WOSBs must certify to the federal government that they are eligible to participate in the WOSB program. These certifications must include a representation that the firm is "at least 51 percent owned and controlled by one or more women." 13 C.F.R. § 127.300(b)(2)(ii). In this context, "[c]ontrol by one or more women . . . means that both the long-term decision making and the day-to-day management and administration of the business operations must be conducted by one or more women." 13 C.F.R. § 127.202(a).



**The Conspiracy to Defraud the United States**

15. Beginning in or about May 2005, and continuing up to in or about December 2014, in the Eastern District of Virginia and elsewhere, the defendant, RONALD A. VILLANUEVA, did knowingly conspire, combine, confederate and agree with other persons to defraud the United States, particularly the SBA, by impeding, impairing, obstructing and defeating through deceit, craft, trickery, and dishonest means the lawful government functions of the SBA in the ascertainment, assessment, and determination of whether the conspirators and their firms, SEK Solutions, LLC ("SEK") and Karda Systems, LLC ("Karda"), should have been accorded status as participants in the SBA's 8(a) program and should have been permitted to continue as 8(a) participants when those firms were, in fact, ineligible to do so.

16. Villanueva resided in Virginia Beach, Virginia while the conspiracy was active between 2005 and 2014. Between approximately January 2010 and January 2018, he served as a member of the Virginia House of Delegates.

17. Villanueva's co-conspirators included—but were not limited to—Khalil Naim; Naim's spouse (hereinafter, "Person-1"); and Samuel Caragan, Villanueva's brother-in-law.

**A. SEK's Initial Participation in the 8(a) Program**

18. In the early 2000s, Naim and Person-1 decided to start a small business, SEK, based on Naim's experience selling software and other computer-related services. In March 2001, Person-1 incorporated SEK in the Commonwealth of Virginia with Person-1 as SEK's sole owner. Early in SEK's history, Person-1 managed the business's operations and Naim managed its sales.

19. In July 2001, SEK applied to join the SBA's 8(a) program on the basis of Person-1's disadvantaged status as the sole owner of the company.



20.     SEK received its 8(a) certification from the SBA in November 2001. The certification lasted for a non-renewable term of nine years, expiring in November 2010.

21.     Between 2001 and 2005, SEK experienced only limited success. Between December 2001 and November 2004, for example, it reported to the SBA that it had earned little to no money in sales through the 8(a) program. During this period, SEK's offices were in Chantilly, Virginia, near where Naim and Person-1 lived.

**B.    SEK Relocates to Virginia Beach**

22.     In or about spring 2005, Naim decided to relocate SEK's offices to Virginia Beach. As part of the move, Naim met the defendant, Villanueva. Villanueva had knowledge of federal contracting programs, including 8(a) contracts, and agreed to assist Naim in managing SEK's business from Virginia Beach.

23.     Within months, and by the latest in or about January 2006, SEK's operations shifted almost entirely to Virginia Beach. At the same time, Person-1's involvement in the company decreased. By January 2006, Person-1 had ceded practically all control over SEK's sales and contract administration to Naim and Villanueva, who together managed the company's day-to-day operations and sales efforts.

24.     By January 2006, Naim began making regular trips to Virginia Beach to manage SEK. While Person-1 periodically traveled to Virginia Beach to spend time with Naim, Person-1 did not conduct business on these trips.

25.     SEK continued to participate in the 8(a) program through November 2010. During this period, Person-1 had little insight into SEK's sales and contracting business even though Person-1 purportedly controlled the company.



C.  **Fraudulent Conduct Relating to SEK's Participation in the 8(a) Program**

26. It was part of the conspiracy that the conspirators made numerous false representations and statements to the SBA about SEK between 2005 and 2010. These false statements and representations related to (i) SEK's eligibility for participation in the 8(a) program, (ii) Person-1's control over SEK and day-to-day management of its affairs, and (iii) SEK's relationship with one of its suppliers.

27. During the SBA's site visit to SEK in Virginia Beach in 2005, Person-1 falsely represented that she worked in Virginia Beach to manage SEK's affairs by meeting with an SBA representative in a borrowed office under the pretense that Person-1 worked there. In reality, Person-1 had never used that office before, never used it again, and never managed the affairs of SEK from Virginia Beach.

28. On or about December 9, 2005; April 27, 2007; March 12, 2008; February 20, 2009; and January 12, 2010, Person-1 signed documents certifying to the SBA that SEK "me[t] the requirements of 13 CFR 124.101 through 124.108." These certifications were false and misleading, in that after 2005:

   a.  SEK was not "unconditionally . . . controlled by one or more socially and economically disadvantaged individuals," *i.e.*, by Person-1, as required by 13 C.F.R. § 124.101;

   b.  Person-1 was not responsible for "strategic policy setting" and "day-to-day management and administration of business operations" at SEK, did not manage SEK "on a full-time basis," and did not "devote full-time to the business," as required by 13 C.F.R. § 124.106, 106(a)(1), and 106(a)(3);



  c.  "[N]on-disadvantaged individual[s] or immediate family member[s]," namely Naim and Villanueva, "[e]xercise[d] actual control [and] ha[d] the power to control" SEK, in violation of 13 C.F.R. § 124.106(e)(1); and

  d.  Person-1 never disclosed, as was required in its annual review forms mandated by 13 C.F.R. § 124.112(b), a substantial line of credit extended to SEK by one of its suppliers.

  29.  Between 2006 and 2014, the federal government maintained a database known as the Online Representations and Certifications Application system, or "ORCA," in which government contractors could complete certifications required under various federal contracting programs. On or about September 19, 2006; September 20, 2007; September 26, 2008; September 27, 2009; and May 20, 2010, Villanueva certified in ORCA that SEK was a "[w]omen-owned business concern," including that its "management and daily business operations are controlled by one or more women." Villanueva also certified in ORCA that SEK "ha[d] received certification by the Small Business Administration as a small disadvantaged business concern" and that "[n]o material change in disadvantaged ownership and control ha[d] occurred since its certification." Villanueva knew that these certifications were false, given that Person-1 had ceded management and control of SEK's sales and contracting efforts to Naim and Villanueva after 2005.

  30.  On or about August 25, 2010, Villanueva assisted in drafting a letter to the SBA that was later sent to the SBA by Person-1. Villanueva's letter was substantially misleading in that it falsely characterized the nature of the relationship between SEK and one of its suppliers and falsely characterized the extent to which SEK relied on other suppliers to fulfill its contracts with government customers.



31. On or about April 19, 2013, Person-1 sent a letter from SEK to the SBA. SEK's letter contained numerous false, fictitious, and fraudulent statements relating to control over the company, including:

    a. "I [Person-1] am the final decision maker of my company's operations and finances, and am fully involved in the everyday operation of my firm." This was false. Person-1 had ceased to be involved in SEK's sales and contracting efforts as early as 2006.

    b. "I [Person-1] commute weekly to Virginia Beach to run SEK Solutions." This was false. Person-1 did not regularly commute to Virginia Beach, and when Person-1 did travel to Virginia Beach it was not to run SEK but to spend time with Naim.

    c. "All final decisions are made by me and include finances, company strategy and mission, hiring and firing of personnel, and operations." This was false. In reality, Naim and Villanueva handled most or all of these functions and had done so for years.

    d. "Kal Naim and Ron Villanueva serve as Executive Vice Presidents, but do not exercise actual control or have the power to control the concern." This was false. In reality, Naim and Villanueva exercised control over SEK's contracting business and had done so since approximately 2006.

**D. The Creation of Karda as a New 8(a) Vehicle for the Conspirators**

32. In or around 2007, Villanueva and Naim came to believe that the success of their business required them to find a way to continue selling products through the 8(a) program even after SEK's 8(a) status expired in 2010. They therefore devised a plan to form a new 8(a)



company that they would secretly control.

33. Sometime in 2007, Villanueva and Naim met with Caragan, Villanueva's brother-in-law. At the time, Caragan lived and worked in northern Virginia and had never met Naim. Together, Villanueva and Naim encouraged Caragan to start a new business. Such a business would, like SEK, be dedicated to selling products to government customers, and would, like SEK, be based in Virginia Beach. Villanueva and Naim told Caragan that they would teach him how to start a small business and would team with him to run the new company. At the time, Caragan had only modest experience in government contracting and no experience running a business. Even so, Caragan agreed to move to Virginia Beach to start a new company, as Villanueva and Naim had suggested.

34. By the fall of 2007, Caragan had relocated to Virginia Beach. In or about November 2007, with the assistance of others, Caragan incorporated Karda with the Virginia State Corporation Commission. The incorporation documents listed Caragan as Karda's sole member.

35. Shortly after Caragan moved to Virginia Beach, it became apparent that he was not going to have a meaningful role in managing Karda at all. Instead, Villanueva and Naim arranged for Caragan to operate a retail storefront for Karda located within the headquarters of another company. In this position, Caragan sold mostly small quantities of products to members of the general public. In an email from January 2008 relating to this arrangement, Villanueva referred to Caragan as "our young apprentice."

36. Villanueva and Naim explained to Caragan that SEK's 8(a) status was set to expire in 2010. They told Caragan that they wanted Karda to obtain its own 8(a) certification so that persons working for SEK could continue pursuing valuable 8(a) contracts for which they



would otherwise be unable to compete.

37. In an email dated February 26, 2009, an accountant working for SEK asked Naim how to book certain expenses that SEK had paid on Karda's behalf. Naim replied, copying Villanueva: "I don't mind doing the expense for Karda, but can we call it something else on our books? SBA will not look too kindly on the fact that we are trying to get Karda up and running to make them an 8(a)."

38. Karda eventually developed a multi-million dollar contracting business selling products to the federal government. Between 2007 and 2014, Caragan had little insight into the operational side of Karda's 8(a) business, as it was run almost entirely by employees or former employees of SEK while Caragan operated the retail storefront.

39. Between 2007 and 2014, SEK extracted money from Karda in a variety of ways, including consulting fees, rent, and other purportedly business-related expenses. In addition to income received directly from SEK, Villanueva received a $50,000 consulting fee directly from Karda.

E.  **Fraudulent Conduct Relating to Karda's Participation in the 8(a) Program**

40. It was part of the conspiracy that the conspirators made numerous false statements and representations to the SBA in support of Karda's application to join the 8(a) program and its continuing participation in the program thereafter. More specifically, the conspirators falsely represented that Caragan controlled Karda and was responsible for its day-to-day management when, in reality, Villanueva and others associated with SEK secretly controlled Karda.

41. Karda applied to join the 8(a) program in or about June 2010 on the basis of Caragan's disadvantaged status. In an email exchange on June 15, 2010, about their mutual priorities, Naim emailed Villanueva: "I don't see [K]arda on your priority list below...Lol!



Karda has to be first. Let's get it done bro…Please! None of this shit means crap if we have no 8a." Villanueva responded, referring to the submission of Karda's application to join the 8(a) program: "Its done buddy. He just sent [it]."

42. Karda's application to join the SBA's 8(a) program, signed by Caragan on or about June 29, 2010, was false and misleading, in that it:

    a. Failed to disclose, as was required, the affiliation between Karda and SEK;

    b. Failed to disclose, as was required, the fact that SEK had provided financial support, office space, and equipment to Karda; and

    c. Falsely stated that Caragan devoted 80 hours per week to the management of Karda, when he in fact did not.

43. On or about July 14, 2010, Villanueva sent a letter, on his official House of Delegates letterhead, to the SBA in support of Karda's 8(a) application. It stated, in part: "I am writing in recommendation of Karda Systems LLC, owned and operated by Virginia Beach native Samuel Caragan." The letter was false and misleading, in that Villanueva knew that SEK was truly operating Karda, not Caragan.

44. Karda received its 8(a) certification from the SBA in or about December 2010.

45. On or about January 14, 2011, Caragan submitted a business plan for Karda to the SBA, drafted in part by Villanueva, which was false and misleading. For example, it stated:

    a. "I, Sam Caragan, have the major responsibility for marketing, financial management, scheduling, cost estimates, bid and proposal development, quality control, and day to day project management oversight." This was false. Caragan had little control over most or all of these functions.



    b.    "Sam Caragan has full and complete oversight of all contracts." This, too, was false. Caragan had little insight into Karda's contracting business.

46. On or about July 7, 2011, an employee at SEK emailed Villanueva and others regarding proposed edits to the website for Karda, seeking Villanueva's input. In response, Villanueva directed the employee to "TAKE OUT ALL REFERENCES TO SEK ASAP!!!!!\"

47. Villanueva ghost-wrote communications on Caragan's behalf for Caragan to send to the SBA. For example:

    a.    On or about January 17, 2012, Villanueva drafted a letter for Caragan to send to the SBA regarding Karda's 8(a) annual report.

    b.    On or about March 26, 2012, Villanueva drafted an email for Caragan to send to the SBA regarding the requirement to send audited financial statements to the SBA as part of Karda's compliance with the 8(a) program.

48. On or about January 14, 2013, and January 17, 2014, Caragan signed documents certifying to the SBA that Karda "me[t] the requirements of 13 CFR 124.101 through 124.108." These certifications were false and misleading, in that:

    a.    Karda was not "unconditionally . . . controlled by one or more socially and economically disadvantaged individuals," *i.e.*, by Caragan, as required by 13 C.F.R. § 124.101;

    b.    Caragan was not responsible for "strategic policy setting" and "day-to-day management and administration of business operations" at Karda, as required by 13 C.F.R. § 124.106; and



    c.    "[N]on-disadvantaged individual[s] or immediate family member[s]," namely Naim and Villanueva, "[e]xercise[d] actual control [and] ha[d] the power to control" Karda, in violation of 13 C.F.R. § 124.106(e)(1).

49.    Villanueva also helped manage SEK and Karda as, in effect, a single firm, in knowing contravention of SBA regulations. For example, on or about March 14, 2014, Villanueva emailed employees at both companies announcing the hiring of a new "business development representative" whose job "will be assisting both SEK and Karda in the growth of their divisions, introducing his network to our solutions, and finding opportunities at home and abroad for all our efforts."

50.    On or about June 30, 2014, Villanueva emailed a representative from another business to market Karda's services as an 8(a) firm. Villanueva wrote: "[W]e are mentoring my brother-in-law's 8(a) called Karda Systems and can help capture some 8(a) special ops and tactical opportunities."

51.    On or about July 24, 2014, Caragan signed a letter on behalf of Karda that was sent to the SBA. It stated, in part: "Samuel M. Caragan is responsible for day-to-day management of Karda Systems, LLC." This was false and misleading. In reality, Caragan ran Karda's retail operation with minimal responsibility for Karda's day-to-day management and with little insight into Karda's primary business of selling products to the federal government.

**F.    Obstruction of the SBA's Lawful Governmental Functions**

52.    The conspirators, by deceit, craft, trickery and dishonest means, defrauded the United States by interfering with and obstructing the lawful governmental functions of the SBA.

53.    To begin, the conspirators made numerous false representations and statements to the SBA after SEK moved its operations to Virginia Beach in 2005. These false statements and



representations prevented the SBA from adequately assessing whether SEK remained eligible for the 8(a) program.

54. The conspirators' false statements about SEK also interfered with and obstructed the SBA's ability to assess whether a "[n]on-disadvantaged . . . entit[y]" had the power to control SEK by virtue of "[b]usiness relationships . . . which cause[d] such dependence" that SEK could not "exercise independent business judgment without great economic risk," in violation of 13 C.F.R. § 124.106(g)(4).

55. Had SBA officials realized that the conspirators repeatedly lied to them about, among other matters, who actually controlled SEK after 2005, they would have terminated SEK from the 8(a) program.

56. The conspirators also made numerous false statements and representations to the SBA about Karda. These false statements and representations prevented the SBA from adequately assessing whether Karda was ever eligible to participate in the 8(a) program.

57. The conspirators' false statements to the SBA also interfered with and obstructed the SBA's ability to assess whether a "[n]on-disadvantaged . . . entit[y]," namely SEK, had the power to control Karda by virtue of "[b]usiness relationships . . . which cause[d] such dependence" that Karda could not "exercise independent business judgment without great economic risk," in violation of 13 C.F.R. § 124.106(g)(4).

58. Had SBA officials realized that the conspirators repeatedly lied to them about who actually controlled Karda, they would have denied Karda's application to join the 8(a) program and would have terminated its participation in the program thereafter.

G. **Contracts and Income Derived from SEK and Karda**

59. Government agencies are responsible for collecting and reporting data on



federal contracts through the Federal Procurement Data System ("FPDS"). According to FPDS records, between 2005 and 2010 SEK was awarded over $60 million in 8(a) contracts.

60. According to FPDS records, between 2011 and 2014 Karda was awarded over $20 million in 8(a) contracts.

61. According to bank records, in the period between 2007 and 2014, Villanueva received approximately $1,040,000 in income from SEK and Karda.

## Conclusion

62. This Statement of Facts is a summary of the principal facts that constitute the legal elements of the offense charged in Count One of the Indictment. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that could be used to determine Villanueva's sentence under the Sentencing Guidelines. Villanueva acknowledges that the foregoing Statement of Facts does not describe all of his conduct relating to the offenses charged in the Indictment nor does it identify all of the persons with whom Villanueva may have engaged in illegal activities.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: *[signature]*
Daniel T. Young
Alan M. Salsbury
Assistant United States Attorneys

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*(signature)*
_____
Ronald A. Villanueva, Defendant

I am Ronald A. Villanueva's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

*(signature)*
_____
Thomas J. Bondurant, Jr., Esq.
Attorney for Ronald A. Villanueva